McCARTHY BROS. CO. v. EQUITY CO-OP. ASS'N OF ENID et al.

(District Court, D. Montana. February 6, 1923.)

No. 176.

1. **Gaming ⟨⟩49(3)—Evidence held not to show that commission house knew that grain elevator association did not intend to make deliveries.**

In an action by a commission house to foreclose a mortgage of a grain elevator association for a balance representing losses incurred in grain transactions, evidence *held* not to show that commission house knew or ought to have known that association's manager intended some of the transactions to be gambling transactions, as no deliveries were intended.

2. **Gaming ⟨⟩49(1)—Transactions for future deliveries of commodities prima facie valid.**

Transactions, speculative or otherwise, in commodities for future deliveries, are prima facie valid, and the burden of proof is on the one who alleges that they are of mutual intent not to deliver, and hence are invalid as being mere wagers.

In Equity. Suit to foreclose a mortgage by the McCarthy Brothers Company against the Equity Co-operative Association of Enid and others. Decree for plaintiff.

William Wayne, of Missoula, Mont., and Chas. R. Fowler, of Minneapolis, Minn., for plaintiff.

Russell, Madeen & Clarke, of Missoula, Mont., for defendants.

BOURQUIN, District Judge. [1] Plaintiff sues to foreclose a mortgage securing an $8,500 balance of account. Defendants answer that said balance represents losses incurred by the association in grain transactions with plaintiff, wherein both parties intended no deliveries, but settlements upon differences—gambling transactions. From the evidence it appears that in August, 1916, certain farmers at Enid,

Mont., incorporated the defendant association, and proceeded to there build a grain elevator of 35,000 bushels' capacity. Pending construction, they employed one Pope as manager, and, buying grain on the track, shipped and sold it on the Eastern markets. In this Pope had control, understood and employed hedging, and engaged the services of commission or brokerage houses, of which one was plaintiff, a corporation at Minneapolis.

Between these parties several mutually satisfactory executed grain transactions occurred in the interval between November, 1916, and January, 1917, in amount $16,700, and February 6, 1917, they entered into a contract wherein the association executed its note, indorsed by its directors, for $5,000 to plaintiff as collateral security "to the account between the parties," and "in consideration of any and all moneys that may be advanced" by plaintiff to the association to buy grain delivered at the latter's elevator, and the association agreed to ship of its purchased grain 75 per cent. to plaintiff "to be handled" on usual commissions. Thereafter were transactions between the parties, Pope acting for the association, as follows:

Drafts by the association against plaintiff, and paid, March 3, $1,000; March 9, $3,000; March 14, $1,000; March 22, $1,000; April 9, $2,000; April 12, $2,000; April 30, $1,000. Grain, by plaintiff bought and sold at the Minneapolis Chamber of Commerce for the association by its order—March 13, sold 5,000 bushels May wheat at $1.80; March 20, bought 5,000 bushels July wheat at $1.82; April 5, sold the July wheat at $1.92, a net profit of $486 credited to the association; April 12, sold 5,000 bushels July wheat at $1.99; April 20, sold 2,000 bushels July wheat at $2.22; April 30, sold 5,000 bushels July wheat at $2.30, and bought the May wheat at $2.55, a net loss of $3,747 debited to the association; May 10, sold 2,000 bushels July wheat at $2.73; May 14 and 15 bought 12,000 bushels of the July wheat at about $2.65—a net loss of $6,100 debited to the associaton. In the meantime the association had shipped but one car of wheat to plaintiff, which was sold May 8, and the net, $2,809, credited to the association. Also in this interval had been correspondence.

April 25 plaintiff wrote to the association that, if it was "not sure of getting in the cash wheat before the middle of May," it would be well to buy back the May wheat and sell July, for that May was "getting tight," and all large elevators were "changing their hedges from May to July," which advice was followed as aforesaid. May 5 plaintiff sent its account to May 1, with balance due, $14,300, to the association, stating it understood the latter had enough grain in to meet the account, and which ought to be got out as soon as possible in settlement. May 10 plaintiff wired to learn total grain on hand; answer, 3,000 bushels; whereupon plaintiff wired, if so, why 14,000 July sold. May 10 plaintiff also wrote that the balance then due was some $18,000, and that wheat should be shipped at once to "take in these hedges."

The contract had its inception in a visit in February, 1917, to the locality by one of plaintiff's field men. His reports are tentatively in evidence over objection; but, as the association argues these reports

support its contention, it is assumed the objection is waived. In any event, the conclusion would be the same. This agent reported to plaintiff that the association was of A 1 personality; that its elevator cost about $8,600; that money in hand and stock subscriptions due would more than pay for it; that Pope was an exceptionally good man, and on track trading to the extent of 22,000 bushels had netted the association $1,700; that Enid had three elevators; that of old crop about 30,000 bushels were yet to come in; that buying at the elevator would commence about February 15; that Enid would hardly handle 350,000 bushels yearly, but Pope ought to get half that, and at least 100,000 bushels; that the association's account ought to be good for at least 150,000 bushels of a fair crop, coming that year; that the association expected to handle about 30,000 bushels more that spring; that until fall plaintiff might have to carry the association for $1,000 or $2,000 more than the $5,000 security note; and that the account had been secured in the face of eager competition.

In April, 1917, and following the death of said agent, another of plaintiff's agents visited Enid, and by Pope and the association's secretary was told that they had on hand about 5,000 bushels of wheat, and expected considerable would come in during the spring. This information was conveyed to plaintiff on May 10, and action was taken as aforesaid. The agent returned to Enid, advised the association of Pope's operations, and procured an accounting and the mortgage in suit.

Thereafter plaintiff advanced more money to, and bought and sold more wheat for, the association, in part of sales actually delivered. Later this suit was commenced. At the trial Pope testified that in respect to some of his transactions aforesaid he did not intend delivery of the grain, but he expected grain to come in to the elevator, and, if it did, deliveries would be made; that he thought wheat would go down, and he was more or less speculating; that margins were neither demanded nor supplied; that he did not advise plaintiff deliveries were not intended; that he was to do the hedging for the association, and that this may be done by buying or selling at exchanges.

In behalf of plaintiff, in addition to the foregoing, the evidence tends to prove that all transactions were in accord with the rules and laws of the Chamber of Commerce, and without knowledge or notice of Pope's intent not to deliver or receive grain, if any such intent he had; that plaintiff handles no accounts, save for country elevators and at terminals; and that hedging involves both buying and selling for the elevator's account.

[2] Adverting to the law of the case, defendants recognize the well-settled principle that transactions, speculative or otherwise, in commodities for future delivery, are presumptively or prima facie valid, and that the burden of proof is upon him who alleges that they are of mutual intent not to deliver, are mere wagers and gambling, and so are invalid. See Brown v. Thorn, 43 Sup. Ct. 36, 67 L. Ed. —— (November 13, 1922), and its citations.

Defendants contend, however, that the burden has been sustained, and the case proven to be of the latter category. This is true par-

tially, if not wholly, in so far as the intent of the association's agent, Pope, is concerned, but not so in respect to the intent of plaintiff. The conditions and circumstances attendant upon each transaction as it occurred are to be taken into account to determine plaintiff's knowledge and intent, but not the final catastrophe, or events not necessary consequences, the most fallible of all criteria.

Before the contract of February 6, 1917, plaintiff had sold five cars of grain for the association, wherein hedging had been employed to some extent, and before any of the said grain sales had closed out one sale and purchase of May wheat. To this latter defendants appeal as a mere wager, settled on differences, and as notice to plaintiff. Although not a hedge on sale to arrive, it well may have been taken as the like on future wheat by an association in continuous actual grain transactions, followed as it was by the shipments aforesaid. That it was closed without actual delivery signifies only that for sufficient reason the association concluded to take a present profit, even as is admitted in respect to another sale and purchase of that time, and which was initiated as a hedge on grain to arrive.

After the said contract, the first transaction, aside from plaintiff's advances to buy grain, was a sale of May wheat, and the second was a purchase of July wheat. Then followed sales and purchases as aforesaid. This purchase of July wheat defendants urge as notice of Pope's lack of intent to deliver, to which plaintiff responds, it assumed it was to close out a hedge on sales through some other broker, some of which the association had theretofore made, and yet could make, or a hedge on stored grain. In respect to the latter, at least, as conditions and circumstances then were, no conclusive reason appears why at the time of the purchase, the vital time, this assumption could not without unreason be made. At any rate, this isolated transaction (out of the case, save for its evidentiary value) was insufficient as present notice of any wagering intent entertained by Pope. He was the trusted agent of the association, otherwise in good faith executing its contract with plaintiff, the latter had then advanced $4,000 on the association's drafts by Pope to buy grain known to be available, and this transaction was not so unusual as to discredit all else and arouse suspicion—was one usual and valid in like circumstances known or to be reasonably assumed. Plaintiff could rely on Pope's good faith, even as defendants did. It was not bound to suspicion of his transactions, or to question his judgment, or to inquire into his intent, until to its knowledge came facts to the contrary sufficient to serve as notice to the average broker or commission house. It must be noted that this is not the ordinary case of marginal transactions between a more or less fugitive customer, not in the grain trade, and brokers.

Whenever the latter appears, the presumption of validity virtually disappears, and if a counter presumption does not arise, as in principle it might, proof of invalidity is practically made, at least unless successfully rebutted by the broker. For it is known of all men that the overwhelming majority of the transactions last aforesaid intend no deliveries, unless therein one can squeeze or break another,

is gambling pure and simple and of most pernicious character, victimizing the world, commonly increasing and rarely decreasing the price of bread, plundering nonparticipants and rich and poor alike for the profit of modern forestallers, engrossers, and regraters, in comparison with which all Monte Carlos pale to insignificance. On the contrary, the instant case and its transactions are those usual and valid between a country elevator association, storing or buying grain at the point of production and selling it at distant terminal markets, and brokerage or commission houses, more or less necessarily employed to dispose of the grain at the latter places.

The circumstances repel inference that plaintiff knew or ought to have known, at the time of the transactions, that in some at least Pope intended mere gambling. Not only did it execute Pope's orders without usual margins, but it advanced to the association $11,000 for Pope's disbursement for grain for future delivery. That these advances would not pay for all grain sold is not very important, in view of the facts that the association was of grain growers, had credit, and it was expected that the grain at intervals would be got in, shipped, sold, and paid for. It is not reasonable to believe that, if plaintiff shared or knew of Pope's wagering intent, it would for so long have incurred so large a financial hazard without security, save the indorsed $5,000 note aforesaid.

There may be some ground for suspicion, but none for a finding against plaintiff upon the issue of intent or knowledge. This suffices to determine the suit against all defendants.

The findings are for plaintiff, and decree accordingly against defendants.